Ex parte Roland Rucker and Melville Quisenberry.

Habeas Corpus — Practice in this Court. — This court has heretofore established the rule of abstaining from comment upon the evidence in *habeas corpus* cases. See facts held to sustain a judgment refusing bail.

Habeas Corpus, on appeal from a judgment rendered by the Hon. T. G. Jones, Special Judge of the Fourth Judicial District.

The appellants and several others were charged by indictment with the murder of Dr. Grayson and his wife, in Anderson County, Texas, on the twenty-third day of April, 1878. The testimony of the most important witnesses is briefly condensed.

Hampton Watts, testifying for the relators, said that, on the Saturday before the Tuesday on which the deceased was said to have been killed, he rode from town with Roland Rucker for a distance of three miles, in the direction of the house where Rucker lives. Rucker had, on that occasion, the gun which witness identifies as the one exhibited now. The witness could not say whether it was a Winchester sharpshooter or a Henry rifle, but thinks it could be charged with sixteen or seventeen cartridges. Did not see the applicant Rucker have any cartridges that day. Rucker invited the witness to "come down" on Tuesday or Wednesday

night, saying that he was going to have a "frolic." He
told witness that he was then going home, and witness did
not see him again previous to the Tuesday of the killing.
The witness knows that Melville and "Babe" Quisenberry
live about three and one-half miles from Palestine, with
their mother, which is about five or six miles from Cal-
vin Rucker's, where the applicant Roland Rucker lives.
"Babe" Quisenberry, who is also known as James Quisen-
berry, owns a gray mule, but the witness is not aware that
the mule has any peculiar mark about its feet. Saw both
Babe and Melville Quisenberry about night, on the night of
the alleged killing. Witness left their house about eight
o'clock that night, going home, and left both of the Quisen-
berrys spoken of there at that hour.

On Sunday, April 21, witness was on Gilbert's place with
Babe and Melville Quisenberry, but did not tell them then
that Rucker had spoken to him about the frolic; nor did he,
in the first instance, promise positively that he would attend
the frolic, as he was hard at work ploughing, and knew he
would be very tired. The witness recollects nothing that
was said to him by Rucker concerning a negro living in the
neighborhood. Went to Quisenberry's on Tuesday even-
ing, but not to tell them that he could not go to Rucker's
frolic, and to send apologies. Witness saw none of the
applicants in town on Monday, but thinks he saw Melville
Quisenberry there on Tuesday. Witness did not come into
town on Tuesday night, and was not in town on Wednesday
morning.

Mrs. Mary E. Quisenberry, the mother of Melville and
Babe Quisenberry, testifying for the applicants, said that
she lived about three and a half miles from Palestine, on
the Crockett Road, and between four and five miles from
Rucker. She is a widow, and her four children — Melville,
James, John, and Jennie — live with her. The last witness,
Hampton Watts, left her house between eight and nine
o'clock on Tuesday night, April 23; and her sons, Mel-

ville, James, and John, went to bed a little before nine o'clock, and she retired about nine. She had a sick headache, and did not go to sleep. James had a very bad cough, and, seeming to be suffering, she carried him a piece of sugar saturated with turpentine, about twelve o'clock that night. The clock struck twelve a few minutes before that. Melville, James, and John were all then in bed. About one o'clock she heard the horses making a noise in the lot, and called to Melville to know if they had been tied up. He was there then, and responded to her, having first asked James the same question, in witness's hearing. The boys remained in their room all night, and got up about light next morning and went about their usual business.

The witness owned four horses and a gray-colored mule. Three of the horses and the mule were at home in the lot all of Tuesday night. There were none of them worked on Tuesday. Two of the horses and the mule were ploughed on Wednesday. James ploughed the mule, and each of the other boys a horse. Witness had heard Harbin's testimony at a prior trial, and knows that he was mistaken when he pointed out Melville as the one who ploughed the mule on Wednesday. Melville did not plough in the same field in which the mule was ploughed that day. It was after six o'clock in the evening of that day (Wednesday) when Harbin and six others came to the house of witness. Hiram Watson passed the house that morning, going in the direction of town, from the south.

The witness's house is about one hundred yards from the road, fronting north. The front-yard gate is ten or twelve yards from the house. The lot and stables are west from the yard gate. When the three boys started ploughing that day, it was as late as one o'clock. They had to bring their horses from the lot into the front yard, hitch them to their ploughs, and go out the front gate. James and John, with the mule and a horse, had to go through the horse-lot into one field, and Melville went on across the road into the " north field."

The boys had gone to their work when the seven men came up. Only two of the seven came up to the house. Witness did not, nor did her sons Melville and James, know Dr. Grayson in his lifetime.

The purpose of the testimony of this witness is to prove that the two Quisenberry boys were at home during all of the night of the killing, and it concludes by reiterating that fact.

W. J. Pierce, for the applicants, testified that he was at Mrs. Quisenberry's on Wednesday morning after the killing, and saw Melville, and directed him to meet him (witness) at the "five-mile post" on the following Saturday, to work the road. Saw no mule-tracks about the house; passed no ox-wagon as he went to the house. He travelled to Mrs. Quisenberry's from the direction of Douthett's, and reached there about eight o'clock, A. M.

Robert W. Chambers, for the applicants, testified that he knew of many gray mules in his neighborhood. Mrs. Quisenberry had one. At the request of B. C. Quisenberry, he made an examination of the right fore-foot of Mrs. Quisenberry's mule. He took his knife out, and cleaned the foot well, then examined it closely, and discovered no unusual formation about it. He then got on the mule and rode it over soft ground, and discovered no unusual impression made by it. Had heard the testimony of witnesses Harbin and Grounds in regard to the impression made by the foot of this mule. The testimony of Henderson Douthett is the same as that of this witness.

B. C. Quisenberry testified that he had heard the testimony of the witnesses Harbin and Grounds, and also that of Horace Word. The two former testified that the mule they traced by tracks left a peculiar impression with the right fore-foot. Otherwise, his testimony was the same as that of Chambers and Douthett. In addition, he testified that he discovered that a small piece of the frog in the left fore-foot was gone, exactly as testified to by Word, but that

he could not discover that it occasioned any depression or peculiarity in the track, and he tried the mule on soft ground.

This witness also testified that he is familiar with the route from Calvin Rucker's to Mrs. Quisenberry's, and knows that James and Melville are likewise familiar with it. Knows also that, not only is the route described by Harbin and Grounds as the one travelled by them the most indirect, but the most difficult of travel, and more distant. It would be difficult of travel during the day, and most awkward at night, even in bright moonlight, because of thick brush, and much fencing and turning.

Horace Word, testifying in regard to the mule's tracks, said that about one-half the frog of the left fore-foot is gone ; and that, though the foot looked like it would make a peculiar track, when tested in sand he could discover nothing unusual about it. The witness knows Fayette Bowen. Has had as many as three conversations with him about this murder since he has been in jail. Talked with him outside the jail, in the court-house yard.

Jennie Quisenberry and James Quisenberry corroborated their mother as to what transpired at their house on Tuesday night, both testifying that Melville, James, John, Jennie, and Mrs. Quisenberry were at the house all night. James testified, further, that when he had ploughed up to the fence on Wednesday, April 24, three men rode up to him, and one, whom witness now recognizes as the witness Harbin, asked him if he had seen any men pass there that morning, and told him that some men had committed a murder on Ironi, and that they had tracked them as far as Fort Houston church, about one mile south-east from where witness lived. Witness answered that he had seen no one. Witness and Melville were arrested on Wednesday by Horace Word, constable of Anderson County.

Mrs. Delitha Ann Rucker, Roland Rucker's mother, testified that her household, on the night of April 23, com-

·prised herself, husband, Calvin Rucker, her two sons, Roland and Reuben, and their wives, and Charlie Key and John Hightower. They were all at home that night except Mrs. Roland Rucker, who was at her father's. Witness's husband, Calvin Rucker, was suffering greatly from a severe pain in his head, and from the asthma; and, with the exception of Mr. Hightower, who went to bed at ten o'clock, they all sat up with witness's husband until after three o'clock. Witness's husband did not lie down, for fear of something. None of the parties who sat up were out of the room over one-half hour at any one time, from eight o'clock until after two that night.

Calvin Rucker corroborated his wife, and testified, in addition, that he thinks Roland went to town on Saturday before the alleged killing, but he did not see him as he came home, and does not know whether or not he brought a gun with him; but on Monday he saw him shooting a strange gun in front of the house. He asked Roland what kind of a gun it was, and where he got it. Roland answered that it was a sixteen-shooter, and that he had agreed to buy it of one Louis, if it suited him, for $15. The gun exhibited resembles the one spoken of.

John T. Hightower and Mrs. Jettie A. Rucker, wife of Reuben Rucker, corroborated the testimony of Mrs. Delitha Ann Rucker, but added nothing important.

N. F. Saddler testified that he was at the house of deceased the Wednesday morning after the killing, arriving there between eight and nine o'clock. The witness saw several cartridge-shells, and one was handed him which he now produces, and identifies and marks "N" on the inside, and "notches" in three places on the open end. Witness saw this shell picked up on the premises, but does not know from what kind of a gun it was shot. He saw others about there similar to the one exhibited. Leaden balls or bullets were also found about the floor of the house, one of which is produced by witness, and marked + across

the end.   Witness saw Mr. Mortimer about the premises
that morning.   Mr. Harbin was also there when witness
arrived, and left, he thinks, about ten o'clock.   Witness
knows of no ill-feeling existing between Hugh Du Puy,
the applicants, and Dr. Grayson, but has heard that bad
feeling existed between Dr. Grayson and Squire Du Puy,
father of Hugh Du Puy.   This unfriendly feeling, the wit-
ness knows, from the statements of the parties themselves,
has existed for several years.   Dr. Grayson was at enmity
with many others in the neighborhood besides Squire Du
Puy, among them the Campbells.

The relators rested.

The State introduced in evidence, from the records of the
court, a former judgment refusing bail to Roland Rucker,
a former judgment refusing bail to Charles Key, a former
judgment refusing bail to Melville Quisenberry, the bail-
bonds of Willis Jasper and Will Wilson, charged with theft
of a beef-steer, — on each of which the name of R. P.
Grayson appeared as surety ; a *capias* for the arrest of
Hugh Du Puy and Roland Rucker, for assault with intent
to murder ; and an indictment against Hugh Du Puy, Roland
Rucker, and other unknown parties, for assault with intent
to murder William Wilson.

G. M. McIntyre testified, for the State, that he lived at
the house of the deceased, Grayson and wife, when they
were killed.   About two o'clock at night he heard some
one halloo.   Mrs. Grayson got up, and asked what was
wanted.   The voice replied that the doctor was wanted, to
attend a sick woman.   Mrs. Grayson told them to get down
and come in ; that the doctor would be ready presently.
She went back to bed, and the doctor stepped out of the
door, pulling it to, and asked where they wanted him to go.
The voice answered that they were camped at Ironi bridge ;
and immediately a heavy volley was fired.   The doctor hal-
looed to his wife to open the door, and then hallooed for
help.   Witness then ran off, as any honest man would.   He

returned afterwards, and moved the doctor's dead body into the house. He was shot from his feet up to his head. Witness then went in to look for Mrs. Grayson, and found her in bed, dead, shot through the eye. Witness found several cartridge-shells around, one of which he produces, and thinks it is such as is used with what is known as a Henry sixteen-shooting rifle. Witness noticed some tracks about the yard, but did not measure them. Witness did not hear the parties when they rode up to the gate; first heard them when one hallooed.

Cross-examined, the witness described the house and its apartments, and said that himself, George McIntyre, Helen Camp, and William Deford were together in the north-east shed-room, the deceased sleeping in the south-east room. Could not recognize the voice, and could recognize none of the parties, as he only saw the flash of one volley. After the parties left, — cannot say how many were in the crowd, — he heard them whooping, and heard the clatter of their horses' feet as they galloped or ran off.

B. F. Wigginton testified, for the State, that on the Tuesday night of the killing he was camped with an ox-team at Fort Houston church, between Mrs. Quisenberry's residence and Palestine. He noticed no one passing his camp between dark and midnight; but between midnight and day, two persons, one riding an iron-gray mule, passed his camp. The moon was shining brightly enough to enable him to distinguish an iron-gray from a flea-bitten or an ordinary gray, and to distinguish a mule from a horse. Had seen an iron-gray mule at Mrs. Quisenberry's since, but could not identify it as the one he saw passing his camp that night, though it resembled it very much. The size was about the same.

W. J. Bridges, who was camped with the last witness, testified substantially the same.

John F. Grounds, for the State, testified that he was one of the party with Mr. Harbin, who followed the tracks of

the horses from Grayson's store, and that went to Mrs. Quisenberry's gate. Witness did not go to the gate with Harbin and another Mr. Grounds, but did go to the gate before he left. He had a conversation with a lady he saw there. Himself and Mr. Salmon rode up to the gate, and she asked them why they were riding about her place that way for. He replied that they were on the track of some men, and that the party had tracked a mule and a horse up to the gate, and could not track them away. She said that she had been sick, and that it frightened her to see men riding over her place as witness and this party were; that she had a mule and a horse on the place, but she hoped witness and others did not suspicion her two "babies." Witness responded that he did not desire to hurt her feelings, and that they were only tracking for their own satisfaction. She asked witness's name, and also that of Mr. Salmon, and returned her thanks for the information. Witness commenced on the trail spoken of about one-quarter of a mile distant from Grayson's place. Could not tell, from the great number of tracks, how many horses were in the crowd.

Julius Burke, for the State, testified that he followed the tracks left by the parties who killed Grayson and wife. The witness did not count the tracks, nor did he notice particularly whether made by horses or mules. He detailed the route taken, very particularly, up to a point where the body of horsemen appeared to have separated into two parties, one of which he followed up to Rucker's stables, and could not track away from there. Walker was with him, and corroborated his evidence.

Y. R. Harbin gave a detailed account of his trip in following the tracks leading from Grayson's, dispersing into parties along the road, and terminating partly at Rucker's, and finally at Quisenberry's. From the number, witness estimates the gang at from seven to eleven or twelve. Among them was a peculiarly marked mule-track. The

right fore-foot seemed to have some kind of protuberance at the frog, which made a depression where the ground was soft. This track was traced along devious ways to Rucker's, and from there to Quisenberry's. This route from Rucker's to Quisenberry's was particularly described by the witness. At the Quisenberry gate it looked as though the riders had dismounted, and the tracks were followed to the lot. Witness saw a gentleman ploughing in a field, and rode out to where he had ploughed to the end of a row. He was ploughing an iron-gray mule, but witness did not examine for peculiar marks about its track. Asked the gentleman, whom he identifies in court as Melville Quisenberry, how long he had been up, and if he had seen two men that morning riding a horse and mule; and received the answer that he was up early, and saw no such travellers. Some of the party rode over to another field, to speak to some other gentlemen working there. When they returned, the party went on to Palestine.

This witness states that, in following the mule-track, he did not lose it but one time between Grayson's and Quisenberry's, and then found it again. The horse-track with it appeared to be that of a large horse, and was worn off on the right side of the fore feet, — the right one appearing most worn. The witness saw a track at Grayson's, near where the horses were hitched, and saw the same at Quisenberry's. The witness left Grayson's about eight o'clock, and reached Quisenberry's about one, or a little after; the distance, as travelled, being eighteen or twenty miles. In following the seven tracks, and the others after they divided, the witness and party sometimes travelled in a walk, at others in a trot, and sometimes in a gallop.

At the house of Grayson, witness saw the tracks of two men, that had not been spoiled. They appeared to be tracks of Nos. 7 and 10 shoes. The smaller number, witness thought, was partially run down, one foot running in and the other running out. Saw exploded shells about, — one

in the hands of William Grounds, and one in the hands of Day or Saddler.

Cross-examined, the witness said that he lost the mule-track but once between Grayson's and Quisenberry's, and that was near Rucker's. He found it, and followed it up to Quisenberry's, as stated. It had rained two or three times just before the killing, but not later than noon on Tuesday. He saw no loose horses on the road from Grayson's to Rucker's. Saw no vehicle-tracks made after the rain, on the road travelled by witness from Rucker's to Quisenberry's, until he got to Chambers's, where he saw the track of an ox-wagon. Witness saw no other horse or mule-tracks along there, besides the two he was following. Saw no loose stock about Mrs. Quisenberry's, nor other stock, except the animals being ploughed. The witness followed the mule and horse-track from Mrs. Quisenberry's front gate to the horse-lot gate. He also saw some shoe-tracks at Mrs. Quisenberry's gate, and though he did not measure them, he judged they were made by a coarse brogan No. 10 shoe. The large track measured at Grayson's was about a No. 10; it was about an inch longer than the No. 9 worn by witness.

Other witnesses testified to the route taken in following up the tracks, but the witness Harbin was the only one who testified particularly to the formation of the left fore-foot of the mule. Other witnesses heard or saw parties travelling the route indicated by the trail, before day on Wednesday morning, but none could recognize any of the party, or knew how many there were. One only saw them near enough to know that there were one or two light-colored, gray, or white animals in the party.

Leander Cannon saw Roland Rucker and Hamp Watts in Palestine on the Saturday before the killing. The former had a gun, with which, he told witness jestingly, he could shoot him sixteen times. Witness didn't know the make of the gun.

Marian Day was at Grayson's house the day following the

shooting.  Saw wadding, cartridge-shells, and a cartridge ;
produces the cartridge, which has a conical-shaped ball, the
point of which the witness has whittled off.  The letter
" H " is stamped on the copper end, and it has two inden-
tations.  Nothing additional was developed by this witness.

Louis Kopf testified that he delivered a Henry rifle to
Roland Rucker on Saturday, the twentieth day of April, for
the purpose of trying it, and buying it if it suited him.  It
has never been returned to him.  Gave him, also, a box of
brass cartridges at the same time.  Each cartridge had the
letter " H " stamped on the copper end.  Witness knows
of no one else in town who has similar cartridges for sale.
The cartridge exhibited is similar to those furnished Roland
Rucker.  Has seen other guns of the kind loaned Roland
Rucker, in Anderson County.

Cross-examined, the witness is certain that the needle to
his gun, which strikes the cartridge when the gun is dis-
charged, had but one point, and would make but one inden-
tation on the copper or bottom end.  Mr. Prather repaired
this gun for witness, once.  The lengthy testimony of this
witness is otherwise but a minute description of the gun
and its operation.  Mr. Prather corroborated the witness
in so far as the witness connected him with the gun, except
that he said the needle in this gun, as in all Henry rifles, had
two points, and would make two impressions on the cartridge.
He recognized the gun exhibited as the one he repaired for
Kopf, some two years before.

Hampton Watts, called for the State, denied that he had
been directed by Thomas D. Scruggs to tell the Quisenberry
boys that he, Scruggs, could not meet them that night
(the night of the killing), and states he did not tell them
any such thing.  He did get some caps from B. A. Durham
on that day, and told him he was going on a camp hunt,
but did not tell him that he was going to Rucker's that
night, and that James Quisenberry and himself were going
to run the witnesses at Grayson's out of the country.

Thomas D. Scruggs testified that he had never heard the Quisenberry boys say any thing about the Graysons, but he saw Roland Rucker in town on Saturday before the killing, and was asked by him to come out to his house on Tuesday night, for the purpose of going to "wait upon some negroes." Witness saw Hamp Watts on Tuesday, and asked him to tell Rucker that he could not come. Saw Melville Quisenberry in town on Monday. He said nothing about Grayson, but asked witness if he was going to Rucker's on Tuesday night; to which witness replied that it was too far.

Chris. C. Rogers testified that he knew all the parties indicted for the murder of Grayson and wife. Roland Rucker came to his room in Palestine, on the Saturday before the killing, and said that Grayson was doing all he could to help the negroes who had had him and Hugh Du Puy indicted; that "we" were going to "wait" upon the negroes, and also upon Grayson, who was letting the negroes have guns. He said that Grayson was a d—d Radical anyhow; that he did not intend that bills of indictment should be found against him in the Federal court, but would kill them all first.

Witness also testified that he was at a meeting on the road, around a fire, about one mile from J. W. Merganthal's, in January, February, or March, 1878. There were present: witness, Roland Rucker, Charles Key, Melville Quisenberry, Hugh Du Puy, Fayette Bowen, S. C. Van Devender, Hamp Watts, and B. F. Gilbert. Does not think that Reuben Rucker and James Quisenberry were present. While standing around the fire, something was said to the effect that Grayson should be made to leave the country. Something in the shape of propositions were made to take Grayson out, or to "wait upon him and those negroes." It was not proposed to go that night, but the effort was to effect an understanding to meet for that purpose at some future time and place. Witness objected to

any thing involving violence to any one, and was joined in his objections by Key and another. Key declined to have any thing to do with it unless witness and Van Devender went into it. The meeting broke up without any under-standing. Roland Rucker, on the Saturday before the kill-ing, told witness that Melville and James Quisenberry, Charles Key, Thomas D. Scruggs, Elias Newsom, Zack Day, and Reuben Rucker were going with him to "wait upon the negroes." Witness had a conversation with the two Quisenberrys in February, 1878, about these negroes. Key told him, in a saloon in Palestine, that Grayson was a d—d Yankee Radical, and ought to be killed. James Quisenberry is the only one of the men indicted for this murder who has not talked to witness before the killing, and tried to get him to go with them, but no two at the same time, or together. Du Puy said something about it at the meeting around the log-heap.

Van Devender corroborated Rogers as to what happened at the meeting.

B. A. Durham testified that Hamp Watts asked him for some gun-caps, in Palestine, on the day of the killing, and told him that the Quisenberrys, himself, and others were going to Rucker's that night, and were going to Grayson's,. and run those witnesses off. He tried to get witness to go with them. Witness declined. Witness and Chris. C.. Rogers arrested Fayette Bowen, Reuben Rucker, and Charles Key, as parties engaged in the killing, and knew that the Governor had offered a reward of $500 each for the arrest and conviction of the murderers. Threats about running the negroes off, etc., as detailed by Rogers, were also made to witness by Roland Rucker and Melville Quisenberry.

B. F. Gilbert, for the applicants, testified that the meet-ing around the log-fire occurred about the 10th of Octo-ber, 1877, instead of the time fixed by Rogers and Van Devender; that the subject of the conference was negro horse-thieves; and Grayson's name was not heard men--

tioned by witness. Hampton Watts corroborated the witness Gilbert.

In the examination in chief, Mrs. Quisenberry testified that on Wednesday morning five horses and a mule came up to her house with one of her horses, and walked about the place. It was also testified that several horses belonging to neighbors ran about Rucker's place, and were seen by members of the family about there on Wednesday morning.

*T. T. Gammage*, for the appellants. Upon the subject of appellants' right to bail, we refer to Const. 1845, art. 1, sect. 10 ; Const. 1876, art. 1, sect. 11 ; *McCoy* v. *The State*, 25 Texas, 38 ; *Ex parte Cooper*, 31 Texas, 186 ; *Yarborough* v. *The State*, 2 Texas, 523 ; *Zimbrod* v. *The State*, 25 Texas,. 548 ; Const. 1876, art. 1, sect. 13 ; art. 16, sect. 48. Upon construction of sect. 11, art. 1, of the Constitution of 1876, and definition of " proof is evident," see Webster's Unabr. Dic. 59, 415, 598, 691 ; *Reed* v. *Levy*, 30 Texas, 742 ; *Southerland* v. *De Leon*, 1 Texas, 304 ; *Thompson* v. *Bulkley*, 1 Texas, 35. Upon question of reasonable doubt, see *McCoy* v. *The State*, 25 Texas, 38 ; *Rosborough* v. *The State*, 43 Texas, 570 ; 1 Stark. on Ev. 570 ; 1 Greenl. on Ev., sect. 13a ; 1 Bishop's Cr. Proc., sects. 1050, 1052, 1053 ; *Payne* v. *The Commonwealth*, 1 Metc. (Ky.) 370. Upon the subject of *alibi*, the proof of and effect of it, see 2 Bishop's Cr. Proc., sects. 29–31 ; *French* v. *The State*, 12 Ind. 670 ; *Colbert* v. *The State*, 1 Texas Ct. App. 320 ; *Chester* v. *The State*, 1 Texas Ct. App. 702 ; *Dorsey* v. *The State*, 34 Texas, 658 ; *Pilkington* v. *The State*, 19 Texas, 214 ; *Walker* v. *The State*, 42 Texas, 370 ; *Ex parte Miller*, 41 Texas, 214. Upon the subject of conspiracy, sufficiency of proof of, and declarations of one co-defendant as to others, see 2 Bishop's Cr. Proc., sects. 229, 230, 233 ; 3 Greenl. on Ev., sects. 89, 91, 94 ; 1 Greenl. on Ev., sect. 111 ; 2 Bishop's Cr. Law, sects. 190, 230 ; 1 Bishop's.

Cr. Law, sects. 633, 641; *Hightower* v. *The State*, 22 Texas, 605. Probability and suspicion as to facts, see Wills on Cir. Ev., side-p. 137; Ram on Facts, 101–208.

White, J.  The record in this case is very voluminous, and somewhat confused in the order of its arrangement. With regard to the proceedings, however, it discloses the facts that the appellants, after having once been refused bail, applied for and obtained from the Hon. W. D. Wood a second writ of *habeas corpus*, upon the ground that important testimony had been obtained, which it was not in their power to produce at the former hearing. Pasc. Dig., art. 2642; *Scurry Foster* v. *The State*, just decided. The application was heard on trial before the Hon. T. G. Jones, special judge, who had, subsequent to the granting of the writ, been elected and qualified to hear the case. The appellants had, with several others, been indicted for the murder of Dr. Grayson and his wife, in Anderson County, on the night of the twenty-third day of April, A. D. 1878.

This second trial resulted in a judgment rendered by the special judge, refusing bail to the applicants, and it is from that judgment that this appeal is prosecuted.

We have most patiently and carefully considered the case as presented in the record, and the law as applicable to the same, together with the able oral argument and brief of counsel for appellants, and we are constrained to say that we are unable to perceive any error committed by the lower court in refusing bail. We forbear to comment upon the testimony farther than to say that the judgment of the court is supported by it. The judgment is therefore in all things affirmed; and it is further ordered that the applicants pay all the costs of this proceeding under the writ of *habeas corpus*.

*Ordered accordingly.*